**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

DG New York CS, LLC, DG 1 Acquisition
Co., LLC, NSF Coventry Site 2, LLC, NSF
Coventry Site 3, LLC, NSF Enfield Site 1,
LLC, NSF Enfield Site 2, LLC, and NSF
Enfield Site 3, LLC,

                              Plaintiffs,

          v.

Norbut Solar Farm, LLC, David Norbut, 2194
State HWY 206, LLC, and Applegate Road,
LLC

                              Defendants.

Case No. <u>1:23-cv-971</u> (GTS/DJS)

## VERIFIED COMPLAINT

Plaintiffs DG New York CS, LLC, DG 1 Acquisition Co., LLC, NSF Coventry Site 2, LLC,

NSF Coventry Site 3, LLC, NSF Enfield Site 1, LLC, NSF Enfield Site 2, LLC, and NSF Enfield

Site 3, LLC (collectively "Plaintiffs" or "NEER"), through their attorneys Boies Schiller Flexner

LLP, file this complaint against Defendants Norbut Solar Farm, LLC, David Norbut, 2194 State

HWY 206, LLC, and Applegate Road, LLC (collectively "Defendants" or "Norbut").

## PRELIMINARY STATEMENT

1.      This action involves two solar projects in New York in which Plaintiffs have

invested millions of dollars, and which are expected to contribute 25 MW of community solar

power toward New York state's ambitious renewable energy goals.  Despite the fact that both sites

are near completion and Plaintiffs have fulfilled all of their obligations under the applicable

agreements, Defendants refuse to execute the necessary easements to allow interconnection

between the solar projects and the electrical grid.  Defendant David Norbut, who controls the

landlord of the parcels on which the solar projects have been built, has been paid, and in the future

1

stands to receive, millions of dollars under the applicable contracts, but refuses to execute the easements required by New York State Electric and Gas (hereinafter "NYSEG") unless Plaintiffs agree to substantial revisions to the purchase agreements so as to allow Norbut to receive potentially millions more in additional payments that he is not entitled to.

2.      Norbut's refusal to execute the NYSEG easements violates several provisions of the applicable agreements between the parties, including, but not limited to, Section 16.10 of the Enfield and Coventry Lease Agreements (collectively, the "Lease Agreements"), which requires Defendants to execute all documents appropriate and necessary to fulfill the purposes of the parties' agreement.

3.      Plaintiffs have even offered Norbut additional concessions, but each time agreement was seemingly reached, Norbut made additional and exorbitant last-minute demands that frustrated any good faith negotiations and Plaintiffs' contractual rights, as well as their substantial investment in building these solar projects.  Plainly, Norbut is holding the projects hostage—demanding increasingly excessive additional concessions to which he is not entitled under the parties' agreements while breaching the plain terms of those agreements.

4.      Norbut's refusal to execute the NYSEG easements will result in inordinate delay in the commencement of solar power production and will cost Plaintiffs an estimated $12,000 per day in lost revenue and the possible loss of millions of dollars in grants awarded by the State of New York. The projects were on track to be connected to the electrical grid in September or October of 2023.   Under normal circumstances, NYSEG would have already begun the construction necessary for interconnection, which is expected to take between 60-90 days, but NYSEG has stated that it will not begin construction until the necessary easements have been executed.  Thus, Norbut's refusal to execute the easements is needlessly delaying the completion

of these projects. Upon information and belief, Norbut does not have the ability to compensate Plaintiffs for this lost income if the delay continues for any extended period of time.

5.    For this reason, Plaintiffs seek a preliminary injunction ordering the Defendants to execute the NYSEG easements. Whatever claim Norbut has to additional funds (and he has none) can be determined in this action, but there is no reason to further delay the operation of these projects and risk the loss of millions of dollars in anticipated revenue.

## PARTIES, JURISDICTION, AND VENUE

6.    Plaintiff DG New York CS, LLC is a limited liability company organized under the laws of Delaware, with an address at 700 Universe Boulevard A1A/JB, Juno Beach, Florida 33408. DG New York CS, LLC's sole member is DG 1 Acquisition Co., LLC, a limited liability company whose sole member is DG 1, LLC, whose sole member is ESI Energy, LLC, whose sole member is NextEra Energy Resources, LLC, whose sole member is NextEra Capital Holdings, Inc., which in turn is owned by NextEra Energy, Inc., a Florida corporation.

7.    Plaintiff DG 1 Acquisition Co., LLC is a limited liability company organized under the laws of Delaware, with an address at 700 Universe Boulevard A1A/JB, Juno Beach, Florida 33408. DG 1 Acquisition Co., LLC's sole member is DG 1, LLC, whose sole member is ESI Energy, LLC, whose sole member is NextEra Energy Resources, LLC, whose sole member is NextEra Capital Holdings, Inc., which in turn is owned by NextEra Energy, Inc., a Florida corporation.

8.    Plaintiff NSF Coventry Site 2, LLC, is a limited liability company organized under the laws of the State of New York, with an address at 700 Universe Boulevard A1A/JB, Juno Beach, Florida 33408. NSF Coventry Site 2, LLC's sole member is DG New York CS, LLC, a limited liability company organized under the laws of Delaware whose sole member is DG 1

Acquisition Co., LLC, whose sole member is DG 1, LLC, whose sole member is ESI Energy, LLC, whose sole member is NextEra Energy Resources, LLC, whose sole member is NextEra Capital Holdings, Inc., which in turn is owned by NextEra Energy, Inc., a Florida corporation.

9.    Plaintiff NSF Coventry Site 3, LLC, is a limited liability company organized under the laws of the State of New York, with an address at 700 Universe Boulevard A1A/JB, Juno Beach, Florida 33408.  NSF Coventry Site 3, LLC's sole member is DG New York CS, LLC, a limited liability company organized under the laws of Delaware whose sole member is DG 1 Acquisition Co., LLC, whose sole member is DG 1, LLC, whose sole member is ESI Energy, LLC, whose sole member is NextEra Energy Resources, LLC, whose sole member is NextEra Capital Holdings, Inc., which in turn is owned by NextEra Energy, Inc., a Florida corporation.

10.    Plaintiff NSF Enfield Site 1, LLC is a limited liability company organized under the laws of the State of New York, with an address at 700 Universe Boulevard A1A/JB, Juno Beach, Florida 33408.  NSF Enfield Site 1, LLC's sole member is DG New York CS, LLC, a limited liability company organized under the laws of Delaware whose sole member is DG 1 Acquisition Co., LLC, whose sole member is DG 1, LLC, whose sole member is ESI Energy, LLC, whose sole member is NextEra Energy Resources, LLC, whose sole member is NextEra Capital Holdings, Inc., which in turn is owned by NextEra Energy, Inc., a Florida corporation.

11.    Plaintiff NSF Enfield Site 2, LLC is a limited liability company organized under the laws of the State of New York, with an address at 700 Universe Boulevard A1A/JB, Juno Beach, Florida 33408.  NSF Enfield Site 2, LLC's sole member is DG New York CS, LLC, a limited liability company organized under the laws of Delaware whose sole member is DG 1 Acquisition Co., LLC, whose sole member is DG 1, LLC, whose sole member is ESI Energy, LLC,

whose sole member is NextEra Energy Resources, LLC, whose sole member is NextEra Capital Holdings, Inc., which in turn is owned by NextEra Energy, Inc., a Florida corporation.

12.     Plaintiff NSF Enfield Site 3, LLC is a limited liability company organized under the laws of the State of New York, with an address at 700 Universe Boulevard A1A/JB, Juno Beach, Florida 33408.  NSF Enfield Site 3, LLC's sole member is DG New York CS, LLC, a limited liability company organized under the laws of Delaware whose sole member is DG 1 Acquisition Co., LLC, whose sole member is DG 1, LLC, whose sole member is ESI Energy, LLC, whose sole member is NextEra Energy Resources, LLC, whose sole member is NextEra Capital Holdings, Inc., which in turn is owned by NextEra Energy, Inc., a Florida corporation.

13.     Defendant Norbut Solar Farm, LLC is a limited liability company organized under the laws of the State of New York, with an address at 1241 University Avenue, Rochester, New York 14607.  Upon information and belief, Norbut Solar Farm, LLC's sole member is David Norbut, a resident of the State of New York.

14.     Defendant David Norbut is the President of Norbut Solar Farm, LLC and a resident of the State of New York.

15.     Defendant Applegate Road, LLC is a limited liability company organized under the laws of the State of New York, with an address at 1241 University Avenue, Rochester, New York 14607.  Upon information and belief, Applegate Road, LLC's sole member is David Norbut, a resident of the State of New York.

16.     Defendant 2194 State HWY 206, LLC is a limited liability company organized under the laws of the State of New York, with an address at 1241 University Avenue, Rochester, New York 14607. Upon information and belief, 2194 State HWY 206, LLC's sole member is David Norbut, a resident of the State of New York.

17.     This Court has personal jurisdiction over Defendants because each Defendant is a resident of the state of New York, Defendants routinely conduct business in the state of New York, and a significant portion of the acts giving rise to this action occurred in the state of New York.

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States and/or citizens of a State and citizens or subjects of a foreign state.

19.     Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(3) and because the parties entered into binding Membership Interest Purchase Agreements that contain the following venue and consent to jurisdiction provision:

> Each of the Parties hereby irrevocably consents and agrees that any legal action or proceedings with respect to this Agreement may be brought in the United States of America Federal Court for the Northern District of New York located in Albany, New York or other Federal courts having subject matter jurisdiction and, by execution and delivery of this Agreement and such other documents executed in connection herewith, each Party hereby: (a) accepts the nonexclusive jurisdiction of the aforesaid courts; (b) irrevocably agrees to be bound by any final judgment (after any and all appeals) of any such court with respect to such documents; (c) irrevocably waives, to the fullest extent permitted by Law, any objection which it may now or hereafter have to the laying of venue of any Action or Proceeding with respect to such documents brought in any such court, and further irrevocably waives, to the fullest extent permitted by law, any claim that any such Action or Proceeding brought in any such court has been brought in any inconvenient forum; (d) agrees that service of process in any such Action or Proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Party at its address in Section 14.01, Notices, or at such other address of which the other Parties shall have been notified; and (e) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Law or limit the right to bring any Action or Proceeding in any other jurisdiction.

*See* Coventry Membership Interest and Purchase Agreement ("MIPA") § 14.12 (attached hereto as Exhibit A); Enfield MIPA § 14.12 (attached hereto as Exhibit B).

## FACTUAL BACKGROUND

20.     Around May or June of 2021, Plaintiffs and their affiliates entered into discussions with Norbut regarding purchasing a portfolio of three solar development projects in upstate New York: one located in the town of Coventry, one in the town of Enfield, and one in the town of Torrey.  Norbut Solar Farm, LLC and an affiliate of Plaintiffs entered into a non-binding letter agreement outlining the terms of the purchase and sale of these projects on July 9, 2021.  The Coventry and Enfield projects form the basis of the present complaint.

21.     The sale of the portfolio containing the Coventry, Enfield, and Torrey projects was designed in part to satisfy potential claims held by certain of the Plaintiffs against some of the Defendants stemming from a previous solar development project known as the Tioga solar project. The parties entered into a Settlement Agreement and Mutual Release regarding the Tioga solar project on December 16, 2021.

## THE ENFIELD PROJECT

### A.     Enfield MIPA

22.     On December 16, 2021, an entity controlled by Norbut and an affiliate of Plaintiffs entered into a series of agreements whereby Norbut and his affiliated entities sold all membership interest in a series of entities created for the Enfield and Coventry projects to Plaintiffs (the "Enfield and Coventry MIPAs") (attached hereto as Exhibits A and B).

23.     Under the Enfield MIPA, Defendant Norbut Solar Farm, LLC agreed to sell its outstanding membership interests in NSF Enfield Site 1, LLC; NSF Enfield Site 2, LLC; and NSF Enfield Site 3, LLC to DG New York CS, LLC.

24.     Under Section 2.03 "Purchase Price Adjustment" of the Enfield MIPA, the parties agreed to an assumed interconnection cost for the purpose of calculating the purchase price that

would be paid to seller.  The parties would later add up the actual interconnection costs and adjust that amount as appropriate.   Under this provision, the parties also agreed that purchaser shall withhold and reserve $209,171.25 from the closing payment, with such amount being referred to as the "interconnection holdback."

25.    In relevant part, Section 2.06 of the Enfield MIPA "Further Assurances, Post-Closing Cooperation and Related Covenants" provides that:

> (a)    Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing: (i) each of the Parties shall execute and deliver such other documents and instruments, provide such materials and information and take such other actions as may reasonably be necessary, proper or advisable, to the extent permitted by Law, to fulfill its obligations under this Agreement; and (ii) upon the request of Purchaser, Seller will, and will cause its Affiliates to, execute and deliver such other documents and instruments and take such other actions as may reasonably be necessary, proper or advisable, to evidence the conveyance by Seller or its Affiliates to the Project Companies of any and all rights, title and interests that Seller or any of its Affiliates holds relating to the ownership or development of the Projects, or to assist in Purchaser being fully constituted with such rights.

26.    In relevant part, Section 5.01 "Regulatory and Other Approvals" of the Enfield MIPA provides as follows:

> Seller shall, and shall cause each of the Project Companies to, as promptly as practicable:
>
> (b)    take all commercially reasonable steps necessary or desirable to obtain all Governmental Approvals and all consents, approvals or actions of, make all filings with any other Person required of Seller, the Project Companies or any of them to consummate the transactions contemplated hereby;
>
> (c)    provide such other information and communications to such Governmental or Regulatory Authorities or other Persons as such Governmental or Regulatory Authorities or other Persons may reasonably request in connection therewith;
>
> (d)    provide reasonable cooperation to Purchaser in connection with the performance of its obligations under Section 6.01, Regulatory and Other Approvals.

27.    Section 5.06 of the Enfield MIPA "Fulfillment of Conditions" provides that:

Seller will proceed diligently and in good faith and will take all commercially reasonable steps necessary or desirable to satisfy each condition to the obligations of Purchaser contained in this Agreement and will not, and will not permit any of the Project Companies to, take or fail to take any action that could reasonably be expected to result in the non-fulfillment of any such condition.

**B.    Enfield Solar Lease and Easement Agreement**

28.    Also on December 16, 2021, Applegate Road, LLC, an entity controlled by Norbut, entered into a series of three Solar Lease and Easement Agreements with NSF Enfield Site 1, LLC, NSF Enfield Site 2, LLC, and NSF Enfield Site 3, LLC, whereby Applegate Road, LLC agreed to lease portions of real property to the NSF Enfield entities for the construction and development of a solar-powered electrical power generation and transmission project (the "Enfield Project"). Other than differences in the leased area, the substance of the three Enfield Lease Agreements are identical and are hereinafter referred to as the "Enfield Lease Agreements."  A copy of the Enfield Lease Agreement with NSF Enfield Site 1, LLC is attached hereto as Exhibit C.

29.    Section 16.10 "Further Documents" of the Lease Agreement provides as follows:

Each Party agrees to perform such further acts and execute such further documents as may be necessary or appropriate to carry out the expressed intents and purposes of this Agreement. Without limiting the generality of the foregoing, Landlord shall execute such maps, applications and other documents as may reasonably be requested by Tenant or any utility or governmental entity in connection with development or operation of the Solar Farm; provided, however, that all costs and expenses in connection therewith shall be paid by Tenant.

Plaintiffs are willing to pay the costs and expenses (if any) in connection with Norbut executing the NYSEG easements, but despite the plain language of the Lease Agreements, Norbut still refuses to execute such easements.

30.    Section 16.19 "Time of Essence" of the Lease Agreement provides that "Time is of the essence of each provision of this Agreement."

9

**C.    Norbut Refuses to Provide the Necessary Easement to Finish the Enfield Project and Makes Additional Exorbitant and Unnecessary Demands**

31.    A critical part of each solar project is the Point of Interconnection ("POI"), where the power generated by the solar cells is connected to the power lines of the utility.

32.    Participants in the solar industry recognize that the exact location of the POI for a particular project will depend on a number of factors, including available easements over neighboring parcels, conflicting easements, economic efficiency, the final designs of the project, and the preferences of the applicable utility.

33.    Plaintiffs and Norbut, all of whom are experienced in the solar business, understood that ultimately, the POI for the project would require input and sign off from the applicable public utility, NYSEG.

34.    When he entered the applicable agreements with Plaintiffs, Norbut, as an experienced solar developer, knew that the final location of the POI for each project would depend on all of the above factors and was subject to change.

35.    Nothing in the applicable agreements bound Plaintiffs, or NYSEG, as the public utility, to accept the tentative POI indicated on the preliminary plans.

36.    Soon after acquiring the interests in the Enfield project, Plaintiffs determined that the POI for Enfield should be moved from the original location (the "North POI"), which had been selected by Norbut in his preliminary design, to a location further south on the property (the "South POI").  The reasons for the POI change were concerns that (i) the North POI might be located in a no-build zone and would potentially require an additional easement and additional steps to verify whether it would be a viable connection site, (ii) the North POI would require an access road to be built over a wetland, which would entail a lengthy permit process and risk that the permit would ultimately not be granted, as well as other environmental concerns; and (iii) to access the North

POI, Plaintiffs would have to build a road and run the power line such that they could make a 90 degree turn and run for several hundred yards north along the solar field, and another 90 degree turn to reach the North POI.  The South POI, in contrast, had direct, immediate access to the proposed NYSEG power line and did not involve building over wetlands.  The South POI was also within the easement granted to Plaintiffs under the appropriate lease.

37.     While the North POI also would require an easement from NYSEG, moving to the South POI would require NYSEG to obtain a transmission easement from Norbut, as landlord, for the construction of five additional poles along the road frontage of the parcel in order to complete interconnection for the project.

38.     Beginning in January 2022, Plaintiffs had extensive discussions with NYSEG about the need and cost of moving from the North POI to the South POI.  Norbut was copied throughout these discussions and accepted the change in the POI location.

39.     Over the course of these discussions, Norbut raised two issues about moving to the South POI.  First, he wanted to make sure that Plaintiffs paid for any additional interconnection costs incurred by the utility as a result of relocating the POI, which Plaintiffs expressly agreed to do.  During subsequent negotiations, the parties expressly agreed that the estimated interconnection cost increase based on the relocation of the Enfield POI was $84,428.  Second, Norbut requested that Plaintiffs provide access for his benefit from the South POI to the far side of the parcel, which required Plaintiffs to design and build a culvert for Norbut's use.  Plaintiffs provided their design plans and specifications for the culvert, which expressly reflected the updated POI location, to which Norbut's representative responded that the design "meets our expectations."  In reliance on Norbut's sign off, Plaintiffs began construction of the South POI, the culvert, and the access road in April 2023.

40.     In addition, relocating the Enfield POI required Plaintiffs to lease a small, additional piece of property near the South POI for drainage purposes, which was outside the original leased area for drainage purposes.  The parties negotiated a land swap agreement whereby the North POI and other substantial pieces of property were going to be returned to Norbut in exchange for certain small areas required by Plaintiffs.

41.     On March 14, 2023, NYSEG wrote a letter to Norbut, attaching maps of the necessary Enfield easements, as well as drafts of the easements, and requested that Norbut execute and return the easements as soon as possible.  Norbut did not execute the easement agreements.

42.     On March 21, 2023, Norbut requested that Plaintiffs update the map to reflect that the leased area for the North POI would be returned to Norbut Solar Farm.  Plaintiffs responded with an updated map, to which Norbut responded "Looks ok Ahmad send agreements once we can see if your looking for any changes."  Plaintiffs then circulated updated maps reflecting the land swap the parties had agreed upon.

43.     On March 27, 2023, Ashley Champion, Norbut's attorney, emailed Jaime Scarff and Ahmad Mardi requesting changes to NYSEG easement language.  Champion wrote: "We need NYSEG to make the handwritten changes shown in the attached for both requested Enfield Easements.  The primary concerns are (i) NYSEG having general ingress/egress rights over the property to reach the easement area, and (ii) NYSEG limiting our ability to construct a future access road crossing the easement area."  Champion requested that Scarff and Mardi follow up with NYSEG to effectuate these changes.

44.     In the Spring of 2023, Norbut made a new demand: he would not sign the easement needed for the connection of the South POI to the NYSEG lines unless Plaintiffs agreed to pay

him the $209,171.25 interconnection holdback under the Enfield MIPA up front.  This demand was confirmed in an April 10, 2023 email from Norbut to Jaime Scarff.

45.     On April 13, 2023, Norbut sent an email to Jaime Scarff reiterating his request that Plaintiffs release the 25% holdback for the Enfield project.  He further stated that he "[v]erbally agreed to land swaps in theory for Coventry and Enfield (due to your redesign of panels) . . . for no cost."  He further claimed that the requested Enfield easement had a value of between $285,000-$865,000.  Plaintiffs agreed to pay Norbut the interconnection holdback amount so as to avoid undue delay in the completion of the project.

46.     On May 4, 2023, Jaime Scarff sent an updated draft of the MIPA amendment to David Norbut, providing for the payment of the interconnection holdback upon Norbut's execution of the NYSEG easement agreement.  Ashley Champion provided Norbut's further revisions to same on May 9, 2023.  She stated that "[t]he inserted concepts have been discussed before, namely: (i) NEER's responsibility for increased interconnection costs based on a project redesign, and (ii) acknowledgment that the IRA benefits available to the projects will be shared between the parties as contemplated under 2.03(d)(5) of the MIPA."  To the same email, Ms. Champion attached the Enfield and Coventry NYSEG easements and stated that "[i]f this looks good, we will execute"—in essence indicating that Norbut was willing to execute the requested NYSEG Easements only if Plaintiffs agreed to their proposed changes to the MIPA amendment.

47.     Norbut's May 9, 2023 amendments to the MIPA were extensive, and went far beyond the issue of releasing the interconnection holdbacks.  In total, Norbut made substantial changes to the three-page draft amendment, most significantly adding demands that Norbut would be entitled to potentially millions of dollars of additional payments as a result of the passage of the Inflation Reduction Act of 2022 ("IRA").

48.     The IRA contains certain tax benefits and financial incentives that may be applicable to the Enfield and Coventry Projects.  The details of these benefits and incentives are not yet known, and it is not at all apparent if Norbut will be entitled to any of these benefits. Plaintiffs have never agreed to or otherwise conceded that Norbut is entitled to these benefits— nor could they, as many of the details of the financial incentives available under the IRA have not yet been released. Indeed, the earliest that Norbut Solar Farm, LLC could potentially be entitled to a portion of such benefits is eighteen months following the projects' date of commercial operation—a date that Defendants are singlehandedly forestalling by failing to execute the NYSEG easements despite their contractual obligations to do so.

49.     Norbut's May 9, 2023 email essentially states that he is holding the NYSEG easements hostage until and unless Plaintiffs agree to the sweeping MIPA amendments concerning the potential benefits included in the IRA, none of which Plaintiffs have ever agreed to.

50.     On May 10, 2023, Jaime Scarff responded to Norbut's email: "Dave, This goes well beyond the scope of the Amendment we discussed.  When are you available to talk?" Norbut responded that he disagreed and did "not believe this is more than we discussed." Jaime Scarff responded and stated that "[t]he MIPA Amendment was meant for a way to allow us to release the interconnection holdbacks in exchange for the easements it was not meant to open up the MIPA language.  We are not amending the MIPA language at this time.  Any of the additional negotiations will need to be dealt with at a later date.  These projects have all the modules, are well under construction and we need the easements ASAP."

51.     Plaintiffs have fulfilled all of their obligations under the MIPAs and Lease Agreements, and in the absence of Defendants' refusal to sign the necessary NYSEG easements, the Enfield and Coventry Projects were expected to be completed and connected to the grid in

September or October of 2023. To date, Plaintiffs have invested substantial resources in the Enfield and Coventry projects, and Norbut's refusal to execute the necessary easements is frustrating the very purpose of the contracts entered between the parties.

52.     In addition, Plaintiffs have detrimentally relied on statements made by Norbut during their months-long negotiations, including investing substantial time and resources into designing and building the Enfield culvert requested by Norbut, beginning construction on the South POI for the Enfield project, clearing trees on the Enfield project and, at Norbut's request, hiring Norbut's brother to complete some of the work. It has now become apparent that Norbut has been acting in bad faith and has no intention of executing the NYSEG easements unless Plaintiffs agree to his exorbitant demands.

## THE COVENTRY PROJECT

### A. The Coventry MIPA

53.     On December 16, 2021, the same date that the parties signed the MIPA for the Enfield project, they signed a nearly identical agreement for the Coventry project (the "Coventry MIPA").

54.     Under the Coventry MIPA, Norbut Solar Farm, LLC agreed to sell its outstanding membership interests in NSF Coventry Site 2, LLC and NSF Coventry Site 3, LLC to DG New York CS, LLC.

55.     Under Section 2.03 "Purchase Price Adjustment" of the Coventry MIPA, the parties agreed to an assumed interconnection cost for the purpose of calculating the purchase price that would be paid to seller. The parties would later add up the actual interconnection costs and adjust that amount as appropriate. Under this provision, the parties also agreed that purchaser shall

withhold and reserve $266,649 from the closing payment, with such amount being referred to as the "interconnection holdback."

56.     In relevant part, Section 2.06 of the Coventry MIPA "<u>Further Assurances, Post-Closing Cooperation and Related Covenants</u>" provides that:

     (a)     Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing: (i) each of the Parties shall execute and deliver such other documents and instruments, provide such materials and information and take such other actions as may reasonably be necessary, proper or advisable, to the extent permitted by Law, to fulfill its obligations under this Agreement; and (ii) upon the request of Purchaser, Seller will, and will cause its Affiliates to, execute and deliver such other documents and instruments and take such other actions as may reasonably be necessary, proper or advisable, to evidence the conveyance by Seller or its Affiliates to the Project Companies of any and all rights, title and interests that Seller or any of its Affiliates holds relating to the ownership or development of the Projects, or to assist in Purchaser being fully constituted with such rights.

57.     In relevant part, Section 5.01 "<u>Regulatory and Other Approvals</u>" of the Coventry MIPA provides as follows:

     Seller shall, and shall cause each of the Project Companies to, as promptly as practicable:

     (b)     take all commercially reasonable steps necessary or desirable to obtain all Governmental Approvals and all consents, approvals or actions of, make all filings with any other Person required of Seller, the Project Companies or any of them to consummate the transactions contemplated hereby;

     (c)     provide such other information and communications to such Governmental or Regulatory Authorities or other Persons as such Governmental or Regulatory Authorities or other Persons may reasonably request in connection therewith;

     (d)     provide reasonable cooperation to Purchaser in connection with the performance of its obligations under Section 6.01, Regulatory and Other Approvals.

58.     Section 5.06 of the Coventry MIPA "<u>Fulfillment of Conditions</u>" provides that:

     Seller will proceed diligently and in good faith and will take all commercially reasonable steps necessary or desirable to satisfy each condition to the obligations

of Purchaser contained in this Agreement, and will not permit any of the Project Companies to, take or fail to take any action that could reasonably be expected to result in the non-fulfillment of any such condition.

**B.    The Coventry Solar Lease and Easement Agreement**

59.    Also on December 16, 2021, Defendant 2194 STATE HWY 206, LLC, an entity controlled by Norbut, entered into a Solar Lease and Easement Agreement with Plaintiff NSF Coventry Site 2, LLC, whereby Defendant 2194 HWY 206, LLC, as Landlord, agreed to lease portions of real property to Plaintiff NSF Coventry Site 2, LLC, as Tenant, for the construction and development of a solar-powered electrical power generation and transmission project.  A copy of the Lease Agreement is attached hereto as Exhibit D).

60.    That same day, Defendant 2194 STATE HWY 206, LLC entered into a Solar Lease and Easement Agreement with Plaintiff NSF Coventry Site 3, LLC, whereby Defendant 2194 HWY 206, LLC, as Landlord, agreed to lease portions of real property to Plaintiff NSF Coventry Site 3, LLC, as Tenant, for the construction and development of a solar-powered electrical power generation and transmission project.

61.    Together, these projects are known as the "Coventry Project."  Other than differences in the leased area, the substance of the two Coventry Lease Agreements are identical and are hereinafter referred to as the "Coventry Lease Agreements."

62. Section 16.10 "Further Documents" of the Lease Agreement provides as follows:

Each Party agrees to perform such further acts and execute such further documents as may be necessary or appropriate to carry out the expressed intents and purposes of this Agreement. Without limiting the generality of the foregoing, Landlord shall execute such maps, applications and other documents as may reasonably be requested by Tenant or any utility or governmental entity in connection with development or operation of the Solar Farm; provided, however, that all costs and expenses in connection therewith shall be paid by Tenant.

63.    Section 16.19 "Time of Essence" of the Lease Agreement provides that "Time is of the essence of each provision of this Agreement."

**C.    Norbut Refuses to Provide the Necessary Easement to Finish the Coventry Project**

64.    Initially, completion of the Coventry project contemplated obtaining an easement from a neighboring landowner, across the street.  However, the neighbor ultimately refused to provide consent, necessitating the placement of one additional utility pole on the Coventry property to connect with the NYSEG power line.

65.    Upon information and belief, Norbut first learned of the need to place the additional pole on Norbut's property in 2022 and did not provide Plaintiffs any advanced warning that he would object to executing an easement to this effect.

66.    On March 8, 2023, NYSEG provided a copy of the Coventry easement to Norbut and requested that Norbut execute and return the easement.  Norbut failed to do so.

67.    On March 15, 2023, Norbut's project manager, Jon Stone, sent an email to Plaintiffs' representatives, Jaime Scarff and Ahmad Mardi, requesting that Ahmad sent the corresponding easement map for Coventry that "graphically shows this easement."  Ahmad responded and provided the updated map provided by NYSEG.

68.    On April 10, 2023, David Norbut emailed Jaime Scarff stated that he would not consent to an easement for this pole unless Plaintiffs immediately agreed to pay him the $266,649.00 interconnection holdback under Section 2.03 of the Coventry MIPA be returned to NSF in exchange for NSF executing the NYSEG easement for the Coventry project.

69.    On April 13, 2023, David Norbut sent an email to Jaime Scarff reiterating his demand that Plaintiffs release the 25% holdback for the Coventry project under the MIPA.  He further stated that he "[v]erbally agreed to land swaps in theory for Coventry and Enfield (due to

18

your redesign of panels) for no cost." In the same email, he wrote that the Coventry easement "request based on past projects in same utility zone we (Norbut) has paid for projects for easements based on road frontage rights signed away." He further claimed that the requested Coventry easement had a value of between $105,000-$290,000.

70.    On or before May 4, 2023, Plaintiffs agreed to pay Norbut the interconnection holdback amount, but Norbut then increased his demand. As discussed in greater detail above, Norbut then insisted that he would only execute the Coventry and Enfield easements if Plaintiffs signed off on extensive revisions to the MIPA that would effectively concede that Norbut was entitled to potentially millions of dollars in financial incentives under the IRA.

**Plaintiffs Have Provided Notice to Norbut that he is Breach of the Covenants Contained in the MIPAs and Lease Agreements:**

71.    Despite several additional attempts to reach an amicable resolution, on May 26, 2023, Matthew Ulman, Vice President for Distributed Generation and Mobility at NextEra Energy Resources, sent a letter to David Norbut via overnight mail and email, providing notice as required under Articles 12 and 14 of the MIPAs, to Norbut that he and his affiliated entities were in breach of the covenants contained in Articles 2 and 5 of the MIPAs as well as Section 16.10 of the Coventry Lease Agreements.

72.    The letter further informed Defendants that "despite numerous reasonable requests and the Seller's contractual obligations under the EnCo MIPAs and the Project Leases, the Seller and the Norbut Lessors have failed to execute and deliver the necessary easements requested by the Utility (the "Utility Easements"). Defendants' "failure to comply with their obligations to provide the necessary easements (the "Breaches") has resulted in the construction of the five (5) EnCo Projects being unreasonably delayed and the timelines for utility interconnection being materially and negatively impacted."

73.     The letter concluded "[a]s a result, the Purchaser and its Affiliates have suffered damages and delays to each one of the projects.  By this notice and demand, the Purchaser and the Project Companies demand that the Seller and the Norbut Lessors immediately and fully cure and remedy the Breaches by (1) the immediate execution of the Utility Easements, and (2) providing compensation in full to the Purchaser and its Affiliates for any and all damages incurred (whether now or in the future) as a result of such Breaches."

74.     As of the date of this filing, Norbut has failed to execute and return the NYSEG easements.

**Norbut's Refusal to Execute the NYSEG Easements Is Preventing the Projects from Being Completed and Jeopardizes Over $4 million in NYSERDA Funding**

75.     Prior to Norbut's refusal to execute the NYSEG easements, the projects were on track to be completed and connected to the electrical grid in September or October of 2023.  Under normal circumstances, NYSEG would have already begun the construction necessary for interconnection, which is expected to take between 60-90 days, but NYSEG has stated that it will not begin construction until the necessary easements have been executed.  Thus, Norbut's refusal to execute the easements is needlessly delaying the completion of these projects.

76.      In addition, Norbut's tactics threaten to deprive Plaintiffs of significant payments by the State of New York and the New York State Energy Research and Development Authority (hereinafter "NYSERDA") under the New York-SUN program.  Under that program, Plaintiffs have been awarded $2,462,872.50 for the construction of the Enfield project and $1,796,073.60 for the Coventry project.  In order to obtain these funds, the Enfield project must be fully operational and delivering energy no later than November 12, 2023 and the Coventry project must be operational by February 1, 2025.

77.     In recognition of the NY-SUN award, Norbut already received a payment of $2,300,000 on or about January 6, 2023 for the Coventry project.  The incentive value relative to the NY-SUN award for the Enfield project was built-in to the $1,900,000 closing cost for the Enfield project, which has already been paid to Norbut.

78.     Should Plaintiffs be denied the NYSERDA awards in one or both projects, its ability to seek return of those funds already advanced to Norbut may be impeded by Norbut's likely argument that such recovery is barred by § 14.14 of the MIPA, which bars recovery of consequential damages.

79.     In addition, should Plaintiffs suffer the loss of the NYSERDA funds, their reputation and relationship with NYSERDA may be significantly compromised and they may adversely affect NYSERDA's consideration of future applications by NextEra.

80.     Norbut's conduct is also preventing Plaintiffs from enjoying, as tenants, quiet enjoyment and reasonable use of the subject premises, for which Plaintiffs are paying $375,000 per year in rent, the first payment of which was made on or about August 23, 2022, and the second payment of which is due September 16, 2023 for both sites, pursuant to Section 5.01 in the Enfield and Coventry Lease Agreements.

81.     Norbut's conduct is also in violation of his interconnection agreement with NYSEG, which he signed for the Enfield projects on May 7, 2021, and for the Coventry projects on April 6, 2021.  These agreements requires Norbut to give full access to NYSEG for the purpose of accomplishing the interconnection.  Plaintiffs, in entering into the agreements in December 2021, relied upon the fact that Norbut had entered into an interconnection agreement with NYSEG.  Obviously, Plaintiffs would not have expended the millions of dollars necessary to bring the

projects to fruition if there were not an agreement with NYSEG to connect the project to NYSEG facilities.

82.    To date, Plaintiffs have expended approximately $32 million in development, solar equipment, and construction costs on the Enfield and Coventry projects, separate and apart from the approximately $6 million Plaintiffs have paid to Norbut.

## COUNT ONE

### (BREACH OF CONTRACT)

### (AGAINST ALL DEFENDANTS)

83.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint.

84.    By failing to execute the necessary Enfield and Coventry easements required by NYSEG, Norbut has expressly breached Section 16.10 of the Enfield and Coventry Lease Agreements, which obligates Norbut to execute such documents as are reasonably requested by the relevant Plaintiffs or any utility in connection with the development or operation of the solar project.

85.    By failing to execute the necessary Enfield and Coventry easements required by NYSEG, Norbut has expressly breached Section 2.06 of the Enfield and Coventry MIPAs, which requires Norbut to execute and deliver documents necessary to fulfill his obligations under the agreements.

86.    By failing to execute the necessary Enfield and Coventry easements required by NYSEG, Norbut has expressly breached Section 5.06 of the Enfield and Coventry MIPAs, which requires Norbut to proceed diligently and in good faith to take all commercially reasonable steps necessary to satisfy each condition to Plaintiffs' obligations.

87.     By failing to timely execute the necessary Enfield and Coventry easements required by NYSEG, and needlessly delaying the completion of these projects, Norbut has expressly breached Section 16.19 of the Enfield and Coventry Lease Agreements, which provides that "[t]ime is of the essence of each provision of this Agreement."

88.     As a direct result of Norbut's conduct, Plaintiffs have incurred substantial economic and reputational damages.  Each day that Norbut continues to withhold the required easements, it is estimated that Plaintiffs will lose $12,000 in lost revenue for the Enfield and Coventry projects in addition to the potential loss of millions of dollars in New York State grants.

## COUNT TWO

### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

### (AGAINST ALL DEFENDANTS)

89.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint.

90.     The Enfield and Coventry MIPAs and Lease Agreements constitute binding agreements entered into between the Parties.

91.     Plaintiffs have performed all of their obligations to date under the terms of these agreements.

92.     Norbut's failure to execute the NYSEG easements, which are necessary in order to connect the Enfield and Coventry projects to the electrical grid, is unfairly preventing Plaintiffs from receiving the benefits they are entitled to under the contract.

93.     As a direct result of Norbut's conduct, Plaintiffs have incurred substantial economic and reputational damages.  Each day that Norbut continues to withhold the required easements, it

is estimated that Plaintiffs will lose $12,000 in lost revenue for the Enfield and Coventry projects in addition to the potential loss of millions of dollars in New York State grants.

## COUNT THREE

## (PROMISSORY ESTOPPEL)

## (AGAINST ALL DEFENDANTS)

94.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint.

95.    Under the terms of the MIPAs and Lease Agreements entered into between the Parties, Norbut unequivocally promised to act in good faith and to do whatever was necessary to effectuate the NYSEG easements.

96.    In addition, Norbut promised to execute the NYSEG easements if Plaintiffs agreed to pay the increased interconnection costs associated with relocating the Enfield POI, a condition Plaintiffs expressly accepted, and if Plaintiffs built a culvert and an access road to benefit Norbut, which Plaintiffs have done.

97.    In addition, Norbut promised to execute the NYSEG easements if Plaintiffs agreed to pay the increased interconnection costs associated with relocating the Enfield POI and agreed to release portions of the interconnection holdbacks, which Plaintiffs agreed to do.

98.    Despite these clear and unequivocal promises, Norbut has refused to sign and execute the NYSEG easements.

99.    Plaintiffs reasonably relied on Norbut's promise and invested significant resources into designing and constructing the Enfield and Coventry projects.  To date, Plaintiffs have invested approximately $32 million in development, solar equipment and construction costs on the Enfield and Coventry projects, not including the approximately $6 million Plaintiffs have paid to

Norbut.  Plaintiffs have otherwise carried out all of their obligations to date under the terms of the agreements.

100.    Each day that the Enfield and Coventry projects are delayed from being connected to the electrical grid will cost Plaintiffs an estimated $12,000 per day in lost revenue, in addition to the millions of dollars Plaintiffs have already invested in the project and additional costs incurred as a result of their reliance on Norbut's promise to perform their obligations under the relevant agreements, and the potential loss of millions of dollars in New York State grants.

101.    Norbut must be estopped from reneging on his promise to act in good faith and to effectuate the NYSEG easements.

## COUNT FOUR

## (BREACH OF THE COVENANT OF QUIET ENJOYMENT)

## (AGAINST ALL DEFENDANTS)

102.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs of this Complaint.

103.    Pursuant to Section 5.1 of the Enfield and Coventry Lease Agreements, Plaintiffs have been paying $375,000 in rent per year to Defendants.

104.    The first payment was made on or about August 23, 2022 and the second payment is due September 16, 2023.

105.    Plaintiffs acquired their interests in the Enfield and Coventry projects for the express purpose of constructing and operating electricity generating solar projects that, upon completion, would be connected to the power lines operated by the applicable public utility.

106.    By refusing to execute the NYSEG easements, which is preventing Plaintiffs from connecting the projects to the electrical grid, Norbut is preventing Plaintiffs from enjoying, as tenants, quiet enjoyment and reasonable use of the subject premises.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

(a)    Preliminary and permanent injunctive relief compelling Defendants to execute the requested NYSEG easements and enjoining Defendants from taking any further actions to frustrate the completion of the Enfield and Coventry projects;

(b)    For actual damages against all Defendants incurred as a result of Defendants' breach of contract, breach of the duty of good faith and fair dealing, and for promissory estoppel;

(c)    Awarding reasonable attorney's fees, interest and costs against all Defendants pursuant to Section 16.10 of the Enfield and Coventry Lease Agreements; and Section 14.13 of the Enfield and Coventry MIPAs.

(d)    Such other and further relief as the Court deems just and proper.


Dated: August 10, 2023
      Albany, New York


                                    */s/ George F. Carpinello*
                                    BOIES SCHILLER FLEXNER LLP
                                    George F. Carpinello
                                    Jenna C. Smith
                                    30 South Pearl Street, 11th Floor
                                    Albany, NY 12207
                                    (518) 434-0600
                                    gcarpinello@bsfllp.com
                                    jsmith@bsfllp.com

                                    *Attorneys for Plaintiffs*

## AFFIDAVIT OF VERIFICATION

STATE OF FLORIDA         )  FLORIDA
                         : ss.:
COUNTY OF Palm Beach )

Jaime Scarff, being duly sworn, states that he is Executive Director of Development—Mergers & Acquisitions for Distributed Generation for NextEra Energy Resources, LLC; that he has read the foregoing Complaint and knows the contents thereof; that the same are true to his own knowledge, except as to those matters alleged on information and belief and that as to those matters he believes them to be true; and that the sources of his information and the grounds of his belief on all matters not based upon his knowledge are records, documents, correspondence, and communications with colleagues.

Jaime Scarff

Sworn to before me
this 10th day of August, 2023

Notary Public

PEGGY WHITE BERTSCHE
MY COMMISSION # HH 345411
EXPIRES: January 21, 2027

27