UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DG NEW YORK CS, LLC,
DG 1 ACQUISITION CO., LLC,
NSF COVENTRY SITE 2, LLC,
NSF COVENTRY SITE 3, LLC,
NSF ENFIELD SITE 1, LLC,
NSF ENFIELD SITE 2, LLC, and
NSF ENFIELD SITE 3, LLC,

     Plaintiffs,


    -v-       1:23-CV-971

NORBUT SOLAR FARM, LLC,
DAVID NORBUT,
2194 STATE HWY 206, LLC, and
APPLEGATE ROAD, LLC,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:      OF COUNSEL:

BOIES, SCHILLER & FLEXNER LLP  GEORGE F. CARPINELLO, ESQ.
Attorneys for Plaintiffs     JENNA C. SMITH, ESQ.
30 South Pearl Street, 11th Floor
Albany, NY 12207

NIXON, PEABODY LAW FIRM   ERIC M. FERRANTE, ESQ.
Attorneys for Defendants
1300 Clinton Square
Rochester, NY 14604

NIXON, PEABODY LAW FIRM   WILLIAM E. REYNOLDS, ESQ.
Attorneys for Defendants
677 Broadway, 10th Floor
Albany, NY 12207

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I. INTRODUCTION

This is a breach-of-contract action over the construction of solar energy farms in the Upstate New York Towns of Enfield and Coventry. Plaintiffs are seven LLCs that have leased parcels of undeveloped land and improved them by building the necessary infrastructure. Defendants are a Rochester-area businessman named David Norbut ("Norbut") and three of his closely held companies that own the parcels of land on which the solar farms sit.

This landlord-tenant relationship is the product of an intentional business model. Norbut (or his affiliated companies) created the plaintiff-LLCs in the first place, set them up with leasehold interests in the land, and sold them off to investors as a kind of package deal that would streamline the build-out of new solar energy projects. Thus, while the plaintiffs in this case are just the tenant-LLCs, the monied investment entity behind them is affiliated with a large energy conglomerate called NextEra.[1]

Broadly speaking, the game plan was for this investment entity to buy "membership interests" in the plaintiff-LLCs with the leases on the land

---

[1] Notably, the verified complaint alleges that NextEra and Norbut have worked together on another project that also ended in litigation.

already in place.  Then, with the investor in control of the plaintiff-LLCs, they would pay to build the solar farms at both sites.  At the end of the day, the parties would connect the completed solar projects to the State's power grid and share the profits through a landlord-tenant relationship.

So far, plaintiffs have sunk nearly $40 million into these two projects, plus an extra $6 million they've paid to defendants.  Construction at the sites has been completed (or nearly so).  But the sites are basically worthless until they start sending electricity to the power grid.  To do that, each site must be hooked up at a Point of Interconnection ("POI").  And these POIs must be built by the State's designated power utility ("NYSEG").

The gist of plaintiffs' four-count verified complaint is that their business relationship with defendants has been a complete headache.  Plaintiffs claim that defendants repeatedly demanded additional sums of money or other valuable consideration in exchange for ordinary or expected changes that had to be made during the build-out phase of these projects.  Plaintiffs say that they grudgingly agreed to these demands just to keep the projects on track.

Despite these repeated concessions, plaintiffs claim that defendants refuse to sign off on certain utility easements in favor of NYSEG unless plaintiffs agree to even more demands.  This is the big sticking point, because NYSEG refuses to begin the work of constructing a POI at either solar farm site until the parties figure out this utility easement dispute.

On August 10, 2023, plaintiffs filed this civil action seeking a temporary restraining order ("TRO") and a preliminary injunction that would require defendants to execute the NYSEG utility easements and enjoin defendants from undermining or threatening the parties' existing contracts. The case was initially assigned to U.S. District Judge Glenn T. Suddaby.

On August 11, 2023, Judge Suddaby denied the TRO and directed the parties to brief plaintiffs' request for injunctive relief. But shortly after he heard oral argument on that motion, Judge Suddaby identified a conflict of interest and recused himself. Dkt. No. 25. The case was reassigned, Dkt. No. 26, and defendants moved under Rule 12(b)(6) to dismiss plaintiffs' complaint in its entirety for failure to state any plausible claims. Dkt. No. 27.

Both motions have been fully briefed. Oral argument on plaintiffs' motion for a preliminary injunction was heard on December 19, 2023, in Utica, New York. Decision was reserved.

## II. **BACKGROUND**[2]

In December of 2021, the parties entered into written agreements for the Enfield and Coventry projects. Compl. ¶¶ 22–27, 53–58. For each location,

---

[2] The facts are taken from plaintiffs' verified complaint, Dkt. No. 1, which is tantamount to an affidavit to the extent it is supported by personal knowledge of an affiant, *see* 28 U.S.C. § 1746, the attached exhibits, and supported in relevant part by the declaration and attached exhibits of Jaime Scarff, an Executive Director at NextEra, the investor behind the plaintiff-LLCs, Dkt. No. 4-3. A review of these submissions and defendants' contrary showing did not reveal any disputes over the essential facts. So the motion can be decided without an evidentiary hearing. *See, e.g.*, *In re Defend H20 v. Town Bd. of E. Hampton*, 147 F. Supp. 3d 80, 96–97 (E.D.N.Y. 2015).

there was a Membership Interest Purchase and Sale Agreement ("MIPA"), whereby the investor purchased an interest in the plaintiff-LLCs that would become tenants on defendants' land.  *Id.*  For each location, there was also a Solar Lease and Easement Agreement ("Lease"), whereby the tenant-LLCs leased each site and were granted certain easements.  *Id.* ¶¶ 28–30, 59–63.

The plaintiff-LLCs undertook an arduous construction and development process at both sites.  But as both projects neared completion, each site gave rise to its own snag.  At the Coventry site, a neighboring landowner refused to consent to the placement of a necessary utility pole.  Compl. ¶ 64.  So an extra pole would need to be placed on defendants' land instead.  *Id.* ¶¶ 65–70.  At the Enfield site, defendants' preferred location for the construction of the POI hookup (the "North POI") proved costly to pursue because it interfered with some federally protected wetlands.  *Id.* ¶ 36.  So the parties tentatively agreed to use a different location that required more extensive site work (the "South POI").  *Id.* ¶¶ 37–40.

The crux of the parties' dispute is over those POIs that NYSEG still has to build in order to connect either site to the power grid.  Defendants refuse to sign off on either NYSEG utility easement unless plaintiffs agree to a new round of demands.  According to plaintiffs, defendants want to "extensive[ly]" amend the MIPAs as a result of the Inflation Reduction Act of 2022 ("IRA"), a new federal law packed with new tax incentives.  Compl. ¶¶ 47–50.  Plaintiffs

admit that this law *might* apply to one or both solar projects in a way that somehow benefits Norbut or his companies, but they say it will take months to find out if either project is eligible for anything. *Id.* ¶ 48. But even if the new law does apply, plaintiffs claim they never agreed to make these projects contingent on substantive revisions to the written agreements. *See id.*

As required by the MIPAs and the Leases, plaintiffs have provided written notice to defendants of their obligation to immediately execute the NYSEG easements. Compl. ¶¶ 71–74. But defendants have stood pat, causing both of the projects to essentially grind to a halt. As plaintiffs explain, NYSEG will not begin work at either site until the easements are executed. *Id.* ¶¶ 75–76. And once NYSEG begins, the process will still take sixty to ninety more days to complete the work at each location. *Id.*

Plaintiffs allege that these ongoing delays are costing them millions of dollars. Plaintiffs also claim that roughly $5 million in grant money they won from New York State and NYSERDA (in solar energy development incentives) will be lost if they do not get the projects hooked up on schedule. Compl. ¶ 76. Plaintiffs say they've already fronted defendants large chunks of this projected grant money in the expectation of receiving the funds on the back end. *Id.* ¶¶ 77–78. Importantly, plaintiffs also claim that if they cannot timely complete these projects, NYSERDA may well refuse to consider them for grant money on future projects in New York. *Id.* ¶ 79.

## III.  DISCUSSION

The parties are here on diversity jurisdiction, Dkt. No. 12, and a clause in their written agreement that lays venue in the federal courts of the Northern District of New York, Compl. ¶ 19.

### A.  Plaintiffs' Request for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Thus, a party seeking injunctive relief must carry the burden to demonstrate "by a clear showing" that the necessary elements are satisfied.  *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 581 (N.D.N.Y. 2017).

Generally speaking, a movant must show: (1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest.  *Page v. Cuomo*, 478 F. Supp. 3d 355, 362–63 (N.D.N.Y. 2020).

However, a heightened standard applies where the requested injunction (1) is "mandatory"; *i.e.*, it would alter the status quo; or (2) "will provide the movant with substantially all of the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  *Page*, 478 F. Supp. 3d at 363.  When either condition is met, the movant must show a

"substantial" likelihood of success on the merits, and must make a "strong

showing" of irreparable harm. *Id.*

The parties dispute whether or not plaintiffs' request for injunctive relief

triggers the heightened standard of review. Defendants argue that plaintiffs'

request for relief is "mandatory" in nature because it would compel them to

take an affirmative act; *i.e.*, sign off on the easements. But plaintiffs have

also identified persuasive authority supporting a conclusion that the ordinary

standard for injunctive relief applies where, as here, a party is seeking to

compel compliance with a counterparty's contractual obligations.

Notably, though, defendants also point out that a preliminary injunction

would provide plaintiffs substantially all of the relief they seek in this civil

action. And because this case involves a dispute over land, it is uncertain if

that relief could be feasibly unwound at a later trial on the merits. Thus, out

of an abundance of caution, the higher standard of review will be applied.

## 1. **Irreparable Harm**

"The showing of irreparable harm is perhaps the single most important

prerequisite for the issuance of a preliminary injunction." *Conway*, 236 F.

Supp. 3d at 589 (citation omitted). "The concept of irreparable harm has

been described as certain and imminent harm for which a monetary award

does not adequately compensate." *Id.* (cleaned up). Put differently, harm is

irreparable "where, but for the grant of equitable relief, there is a substantial

chance that upon final resolution of the action the parties cannot be returned to the position they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

Upon review, plaintiffs have made a strong showing on this threshold requirement. Although they acknowledge that much of their harm could be measured in money damages, plaintiffs make two salient points. *First*, there is a strong likelihood that the money already paid to the landlord-defendants could not be recovered with a favorable judgment because the defendants are just shell companies. *Cf. Brenntag Int'l Chems., Inc.*, 175 F.3d at 249.

*Second*, and much more importantly, plaintiffs have clearly demonstrated that they have suffered (and will continue to suffer) reputational harm and the loss of future business opportunities. As plaintiffs explain, missing the project deadlines threatens their ongoing relationship with NYSERDA, the entity that doles out the solar grant money in New York.

The Court agrees with plaintiffs that the unusual fact pattern presented by this case—which puts an investor at risk of being excluded from future business opportunities, including future grant funding that makes their business model profitable in the first place—gives rise to a strong showing of

irreparable harm.  *See* Pls.' Mem., Dkt. No. 4-2 at 23–24 (collecting relevant cases).[3]

### 2. <u>Likelihood of Success on the Merits</u>

Plaintiffs' verified complaint asserts claims for breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), promissory estoppel (Count Three), and breach of the covenant of quiet enjoyment (Count Four).  To warrant preliminary injunctive relief, plaintiffs must show a substantial likelihood of success on the merits of at least one of these claims.  *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018).

### i. <u>Breach of Contract</u>

Plaintiffs argue that defendants' refusal to execute the NYSEG easements is a breach of the MIPAs, the Leases, and even some separate contracts that the LLCs executed with NYSEG.[4]  The relevant provision(s) of each document is set forth in detail in plaintiffs' memorandum of law and attached as exhibits to the verified complaint.  Pls.' Mem. at 11, 12–13, 14.

The upshot of plaintiffs' argument is simple: the purpose of the parties' written relationship is to build out these solar sites and connect them to the power grid.  Plaintiffs point out that various provisions in the agreements are

---

[3]  Pagination corresponds to CM/ECF.

[4]  These so-called "Interconnection Agreements" were signed by the plaintiff-LLCs with NYSEG, but were negotiated by defendants *before* plaintiffs bought into the LLCs by signing the MIPAs.

framed in a way that contemplates the need for further actions by one or both parties, including the execution of any documents that are "reasonably [ ] necessary" as well as a covenant to take all "commercially reasonable steps necessary" to carry out the projects to completion.  According to plaintiffs, defendants' attempt to condition the execution of the NYSEG easements on new or additional demands is a breach of these agreements.

In opposition, defendants raise a host of specific arguments that boil down to the same basic premise: plaintiffs are the ones trying to re-negotiate these deals.  Defs.' Opp'n, Dkt. No. 9 at 14–19, 21.  As defendants explain, Norbut's business model is built on purchasing abandoned or underutilized parcels of land, getting the sites "properly permitted and shovel-ready," working with solar operating companies to build solar projects on *part* of that land, and then retaining the rest of the parcel—usually the more desirable sections, with frontage on the public right-of-way—for other development.  *Id*. at 10.

Defendants argue that plaintiffs are the ones trying to "bully" them into unilaterally relocating, adjusting, and/or renegotiating the POI hookups at both the Enfield and Coventry sites.  According to defendants, plaintiffs signed a series of written agreements that cover how these issues will be handled.  Indeed, defendants point to the same documents (the MIPAs, the Leases, etc.) on which plaintiffs rely.  Defs.' Opp'n at 10–12.  Defendants argue that they are entitled to new or additional consideration because the

relocation or adjustment of the POIs impact "new" or "additional" areas of the parcels (*i.e.*, plaintiffs seek to encumber valuable portions of land at both sites that defendants had retained for other development). *Id.* at 10–13.

In reply, plaintiffs accuse defendants of claiming a unilateral right to hold these projects hostage unless plaintiffs agree to new demands. Regardless of any confusion about the POI location at the <u>Enfield</u> site, plaintiffs claim that defendants' objection to the utility poles at the <u>Coventry</u> site shows that this is just extortionate behavior. And to the extent defendants complain about the extra lost value of the undeveloped land, plaintiffs argue that defendants were fully aware that *some* value would be lost as part of these projects.

Upon review, plaintiffs have made a substantial showing that they are likely to succeed on the merits of their breach-of-contract claim. "Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Swan Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012) (citations omitted).

A review of the contractual provisions identified by plaintiffs, especially when measured against the parties' general areas of consensus about the scope and purpose of these comprehensive agreements, strongly indicate that plaintiffs will succeed on this breach-of-contract claim. Among other things, plaintiffs have made a strong showing that defendants' refusal to sign off on

the NYSEG utility easements undermines plaintiffs' efforts to perform under the agreements and frustrates the purpose of the business relationship.

Although defendants attempt to minimize the ongoing nature of their own responsibilities (and characterize the MIPAs in particular as being limited to the transfer of the LLCs), that position just cannot be squared with the rest of this fact pattern. *Cf. Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 113–14 (2d Cir. 2014) ("When interpreting a contract, our primary objective is to give effect to the intent of the parties as revealed by the language of their agreement." (cleaned up)).

### 3 & 4.  The Balance of Hardships & The Public Interest

Plaintiffs have also satisfied the remaining elements necessary to win injunctive relief.  First, the balance of hardships clearly favors plaintiffs.  To be sure, defendants have identified some additional damage and/or lost value to the parcels that will result from the construction and development changes at both sites.[5]  But plaintiffs have fronted many millions of dollars to develop these solar projects.  They are unable to move forward with the solar projects contemplated by the agreements unless the easements are secured.

Second, and relatedly, the public interest would be served by bringing more renewable energy projects online and reducing the State's reliance on

---

[5]  The Court takes no position on whether that harm might be compensable, whether under the agreements or otherwise.

burning fossil fuels.  In short, both factors favor enforcing the parties' written agreements according to their terms, which were negotiated at arms' length by experienced counsel.

### 5.  Posting of Bond or Security

The final question is about security.  Generally, a preliminary injunction may not issue unless the movant "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).

This bond requirement serves to "assure[ ] the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff."  *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011).  But the district court is vested with "wide discretion in the matter of security," and may waive bond if there is "no proof of likelihood of harm" to the non-movant.  *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 505 (E.D.N.Y. 2021).

Upon review, plaintiffs must post bond in the amount of $100,000.  Based on the existing record, this amount appears sufficient but not greater than necessary to protect defendants' interest in the event they are able to show that they were wrongfully enjoined after a trial on the merits.

## B. <u>Defendants' Motion to Dismiss</u>

As noted *supra*, defendants have moved to dismiss plaintiffs' verified complaint in its entirety.  To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the speculative level.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While legal conclusions can provide a shell or framework for the complaint, they must be supported with allegations of fact.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

A review of defendants' motion to dismiss reveals that it overlaps heavily with their opposition to plaintiffs' preliminary injunction motion, and in particular with plaintiffs' arguments about their likelihood of success on the merits of their claims.  For instance, defendants argue that the existing

agreements do not require them to execute the NYSEG easements because the contracts only describe specific easements on specific land (and they have survey maps to show those spots). So in defendants' view, a new or changed easement would be an amendment for which defendants would be entitled to new consideration (or could even refuse). According to defendants, the MIPAs are about the sale of the plaintiff-LLCs, not about changes in the construction or site layout that might need to happen *after* closing the sale.

In opposition to dismissal, plaintiffs argue that defendants' contentions rely on disputed facts (that would not be appropriate to resolve on a motion to dismiss) or on alleged falsehoods and perhaps misrepresentations (that could be shot down in discovery). Notably, plaintiffs argue that the precise location of the NYSEG easements are not provided for in writing in these kind of projects because it is NYSEG, and not any other party, who gets to decide the final location. According to plaintiffs, the written agreements are set up for this uncertainty—after NYSEG approves a final spot, the agreements require the landlord-defendants to sign off on it.

Upon review, defendants' motion to dismiss must be denied. Plaintiffs have already established that they are substantially likely to succeed on the merits of their breach-of-contract claim. And although the Court has not specifically analyzed the likelihood-of-success question attached to plaintiffs' other claims (*i.e.*, for breach of the implied covenant of good faith and fair

dealing, promissory estoppel, and breach of the covenant of quiet enjoyment), a review of the parties' briefing and plaintiffs' opposition confirms that, at the very least, plaintiffs have stated *plausible* claims for relief.

## IV.  **CONCLUSION**

Plaintiffs have shown that they are entitled to preliminary injunctive relief.  Defendants have not shown that plaintiffs' verified complaint fails to state one or more plausible claims for relief.

Therefore, it is

ORDERED that

1.  Plaintiffs' motion for a preliminary injunction is GRANTED;

2.  Defendants' motion to dismiss is DENIED;

3.  Plaintiffs shall POST SECURITY in the amount of $100,000 with the Clerk of the Court for the U.S. District Court, Northern District of New York;

4.  Upon the posting of this security, defendants, their officers, agents, employees, attorneys, and successors, and all other persons in active concert or participation with them, are preliminarily ENJOINED such that (a) an appropriate representative from defendants must immediately execute the NYSEG easements necessary to complete work at the Enfield and Coventry sites; and (b) no further action shall be taken to undermine or threaten the parties' existing agreements; and

5.  Defendants shall file an answer to the operative complaint.

IT IS SO ORDERED.

Dated:  January 8, 2024
        Utica, New York.

David N. Hurd
U.S. District Judge